# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 28, 2022

## STATE OF TENNESSEE v. LONNIE LYNN GRAVES

**Appeal from the Criminal Court for Monroe County**
**No. 20-078   Sandra Donaghy, Judge**

_____

**No. E2021-00647-CCA-R3-CD**

_____

Defendant, Lonnie Lynn Graves, pled guilty to possession of 26 grams or more of methamphetamine with intent to sell or deliver, possession of a firearm with the intent to go armed during the commission of a dangerous felony, and felon in possession of a firearm but specifically reserved a certified question of law pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure.  The question pertained to the legality of the search of Defendant's vehicle during a traffic stop for speeding which was the subject of an unsuccessful suppression motion.  Because the judgments failed to comply with the strict requirements of Rule 37(b)(2)(A), Defendant did not properly reserve a certified issue for review.  As a result, we are without jurisdiction to review the merits of Defendant's claim, and accordingly dismiss his appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Appeal Dismissed.**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and W. CAMPBELL, SR, JJ., joined.

Darren V. Berg, Knoxville, Tennessee, for the appellant, Lonnie Lynn Graves.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins Senior Assistant Attorney General; Stephen D. Crump, District Attorney General; and Ashley Ervin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Facts and Procedural History

This appeal arises from a certified question of law regarding the legality of a search during which law enforcement found illegal drugs and contraband in Defendant's truck. After the trial court denied his motion to suppress the evidence found during the search, Defendant pled guilty to the indicted drug-related charges subject to the outcome of the appeal of this certified question. The record on appeal consists primarily of testimony given at Defendant's suppression hearing and the video recording of the stop and search from the arresting officer's body camera.

At the suppression hearing, Aaron McMahan, a patrol officer in the Vonore Police Department with roughly twelve years of experience testified that on April 14, 2018, at approximately 7:30 p.m., he observed a white GMC truck traveling at a high rate of speed on Highway 411 in Vonore. The police radar measured the truck's speed at 61 miles per hour in a 45-mile-per-hour zone. Consequently, Officer McMahan initiated a traffic stop.

Officer McMahan followed the truck into the parking lot of the Vonore Drug Store, parked behind the truck, approached the driver side of the truck, and came into contact with Defendant whom he recognized based on prior contact. There was also a passenger in the truck who was unknown to Officer McMahan. Officer McMahan testified that during a traffic stop, he normally introduces himself, identifies the agency he works for, and asks for the driver's license, insurance, and proof of registration; he affirmed that he did so when he pulled over Defendant. Officer McMahan recalled that it took him less than a minute from the time he initiated his lights to when Defendant pulled over. He notified the dispatcher that he was about to initiate a traffic stop before approaching Defendant. "Having previous experience with [Defendant]," Officer McMahan called for backup. Dennis Graham, a fellow officer in the Vonore Police Department, arrived at the scene in his patrol car to provide assistance.

Officer McMahan confirmed that he wears a body camera ("bodycam") while on patrol and was wearing one when he pulled over Defendant. The bodycam was located on the left breast pocket of his uniform and recorded the traffic stop including the timeframe of the stop. Officer McMahan explained that Defendant could not locate his license despite looking in the glove compartment and the dashboard of his truck. Because Defendant was unable to produce his license, Officer McMahan recalled using other information such as Defendant's social security number and date of birth to identify Defendant. Officer McMahan asked Defendant for consent to search his truck but Defendant declined. Officer McMahan's bodycam video recording of the traffic stop was played following Officer McMahan's direct testimony.

- 2 -

The bodycam recording begins as Officer McMahan approaches the driver side of Defendant's truck and informs Defendant that he was pulled over for speeding. Officer McMahan asks for Defendant's license, car registration, and proof of insurance. Defendant advises Officer McMahan that he "just bought the truck" and was making his way to Knoxville to visit his daughter who was in the hospital recovering from a motorcycle accident. As Defendant continues to look around the inside of his truck for his driver's license, Officer McMahan walks back to his patrol car.

In his patrol car, Officer McMahan tells the dispatcher that he is handling a traffic stop for speeding. The bodycam only picks up Officer McMahan's side of the conversation as he appears to be talking with another officer discussing Defendant and whether he should ask Defendant for consent to search his vehicle. When Officer McMahan returns to Defendant's vehicle, Defendant hands over his registration and insurance paperwork, but cannot find his license. Officer McMahan asks Defendant to walk back to his patrol car so they can have a "conversation." As they stand in front of his patrol car, Officer McMahan asks Defendant if he has any weapons and pats him down. Nothing is found during the pat down search. It is during the "conversation" that Officer McMahan asks Defendant for consent to search his truck due to "run-ins in the past." Defendant asks why a search is needed, and Officer McMahan replies: "Looking for anything illegal, marijuana, methamphetamine, cocaine, dead body, hand grenade, any of that good stuff. . . of course with your consent." Defendant does not understand why a search is needed for speeding. Officer McMahan simply asks Defendant for a "yes" or "no" on the consent to search. Defendant clearly says, "no," and Officer McMahan replies, "okay."

Defendant is seen talking to another officer who has arrived on the scene, but cannot be heard clearly on Officer McMahan's bodycam. Initially, this officer, Officer Graham, cannot be seen on the bodycam. He eventually comes into view and Defendant's side of the conversation can be heard clearly. Defendant asks Officer Graham what the officers are looking for to necessitate a search. Defendant stresses that he is late in visiting his daughter and that visiting hours will be over soon. Officer Graham can be heard telling Defendant "that will speed process up to get you out of here." Defendant still cannot understand the need for a search and responds, "It's crazy." It is at this point Defendant claims he denied consent for the second time. Neither party disputes the second denial of consent.

After Defendant has denied consent a second time, Officer McMahan walks toward the back of his patrol car to take a call. After Officer McMahan finishes the call, he returns to Defendant who is leaning against the hood of Officer McMahan's patrol car. In the background, Officer Graham can be seen walking to the passenger side of Defendant's truck. The passenger can be seen exiting the truck and walking to the front of the truck.

The passenger door remains open, and the passenger is obscured by the truck. Officer McMahan walks away from Defendant and closer to Officer Graham and the passenger. Officer McMahan can be heard on his cell phone waiting on Defendant's "status." As Officer McMahan walks to his patrol car past Defendant, he can be heard telling Defendant to "hang tight, working on speeding things up a bit." Officer McMahan steps into his patrol car and continues to wait on the status of Defendant's driver's license.

Thirty seconds after Officer McMahan gets into his patrol car, Officer Graham approaches Defendant while he leans against the front hood of Officer McMahan's patrol car. Defendant and Officer Graham are seen to have a conversation, but they cannot be heard on Officer McMahan's bodycam.

One minute and twenty seconds after he approaches Defendant a second time, Officer Graham begins talking on his cell phone and walks over to Officer McMahan. He tells Officer McMahan that Defendant is "going to give consent." Officer Graham returns to Defendant while Officer McMahan remains in his patrol car and waits for the status of Defendant's driver's license. In the meantime, Officer Graham ends his call and begins searching Defendant's truck.

A little over a minute after Officer Graham begins searching Defendant's truck, Officer McMahan learns that Defendant has a valid license and hangs up. However, he remains in his patrol car. Officer Graham's search of the truck can be seen on the bodycam. Officer Graham pulls down the tailgate and instructs the passenger to sit there. Shortly after, Officer McMahan gets out of his patrol car and informs Defendant that he will receive a citation for speeding but will not be cited for not having his driver's license. Defendant tells the passenger that he will have to drive his truck.

Officer McMahan tells Defendant, "That's it as far as this stuff goes." Defendant replies that he did not think he was speeding. When asked whether he is on probation, Defendant responds that he is on federal probation. Although Officer Graham cannot be seen on the bodycam, Defendant tells him that there are "a bunch of tools under the seat there." A minute later, Officer Graham walks from the passenger side of the truck to his patrol car carrying something in his left hand. Defendant continues to watch. Another minute later, Officer McMahan asks Defendant if the truck and jacket belong to him. Defendant replies yes to both. The jacket is on the hood of Officer Graham's patrol car. Thirty-nine seconds later, Officer McMahan tells Defendant, "Not sure what to do with you yet, but I am going to detain you." Although Defendant is not under arrest, he is told that he is not free to go. Defendant is handcuffed and remains seated on the hood of Officer McMahan's patrol car.

- 4 -

Sixteen seconds later, Officer Graham walks to Officer McMahan and Defendant carrying a backpack. Twenty seconds later, Officer McMahan "change[s] [his] mind" about arresting Defendant when he sees Officer Graham hold up a clear plastic sandwich bag with white powder. When questioned by Officer Graham, Defendant answers that he does not know how much of the white powder he has in his bag but later mentions "three to four ounces." A full view of the contraband is seen on the back hood of Officer McMahan's car including a wad of cash. Defendant states that he did not know he "had it in there." Officer Graham replies, "You're not going to misplace that much." Defendant reveals that he gets the drugs from Georgia and that someone brings it to his house. The recording ends after the backpack is placed on the back hood of Officer Graham's patrol car.

On cross-examination, Officer McMahan acknowledged that he did not hear Defendant give Officer Graham consent to a search during the stop. Defendant was standing in front of Officer McMahan's car with a clear view of Officer Graham searching Defendant's truck. Officer McMahan did not hear any objection from Defendant while his truck was being searched. Officer McMahan had presented Defendant with the citation for speeding before Officer Graham had alerted him about what he had found in the truck. After the search was completed, Officer Graham alerted Officer McMahan that "some illegal substance" was found in the truck and that Defendant should be placed in custody. After he was placed in custody, Defendant signed a consent to search form. The form was exhibited to the hearing over Defendant's objection. Officer McMahan denied that Defendant was "hostile," "agitated," or "angry" with him during the stop.

Officer McMahan testified that as a former officer in the Englewood Police Department he had previous interactions with Defendant. Notably, he had received complaints from concerned citizens that Defendant was selling methamphetamine out of his home in Englewood and that firearms were also involved. Neighbors had complained of drug users coming and going from Defendant's home. Despite the complaints, Officer McMahan testified that he had not previously arrested Defendant on any offenses including drug offenses. He had however, pulled over Defendant for a traffic violation.

Officer McMahan was asked to explain or clarify certain passages in the video recording of the stop. Specifically, Officer McMahan was asked what he meant when he told Officer Graham that "those times I asked him for it he's given it." Officer McMahan explained that when he had previously pulled over Defendant for a traffic violation and asked for consent to search, Defendant had given him permission to do so.

Officer McMahan reiterated that there was probable cause to arrest Defendant during the stop when Officer Graham found an illegal substance in Defendant's jacket which was found during the search of Defendant's truck. Officer McMahan testified that

he detained Defendant when he received "a signal for a safety" from Officer Graham. Officer McMahan agreed that the consent form did not state the time when the consent was given.

Officer McMahan testified that the basis for the continued detention was Defendant's consent to search his truck:

> Officer Graham had obtained consent to search while I was writing the citation. And in the video he is conducting that search. And [Defendant] expressed no interest or expression that he wanted to leave. So Officer Graham continued with the search.

When asked how many times an officer can ask for consent, Officer McMahan replied that in Defendant's case, he asked Defendant "once" and "was refused." He added that because Defendant refused, Officer McMahan did not search Defendant's truck. Officer McMahan later agreed with defense counsel that on the bodycam recording, he could be heard asking for consent twice and Defendant refused to give consent both times. Officer McMahan testified that he received training on obtaining a valid consent to search. In terms of whether he received training on the number of times an officer can ask for consent, Officer McMahan replied, "To my knowledge there's no set amount. No means no. Yes means yes."

Officer McMahan learned from Officer Graham that a K-9 officer was on the way to the scene. Officer McMahan recalled Officer Graham leaning in to tell him that Defendant had given consent as Officer McMahan was in his patrol car and writing up the citation.

Officer McMahan explained that it would have been quicker to process Defendant had he produced his driver's license. In that scenario, Officer McMahan would have received information on Defendant's license via radio transmission. Because Defendant did not have his license, Officer McMahan had to call a different source to obtain Defendant's information which required more time. He could not specify how much time was added to the stop because Defendant did not have his license. After watching the relevant portion of the bodycam recording, Officer McMahan agreed that it took two and half minutes to check on the status of Defendant's license. Officer McMahan testified that a person pulled over for speeding is generally held ten to twenty minutes to write up a citation depending on a number of variables. Officer McMahan acknowledged that he does not routinely request backup for speeding but did so in this case because of his prior dealings with Defendant and because Defendant had a passenger. Officer McMahan denied that Defendant had previously acted inappropriately or violently in the past. He maintained that he requested backup for safety.

- 6 -

Dennis Graham, director of emergency management for Monroe County, testified that on April 14, 2018, he was an officer with the Vonore Police Department. Officer Graham[1] testified that his background in law enforcement included a five-year stint in the Monroe County Sheriff's Department first as a patrol officer and later as a narcotics detective. He had experience obtaining consent to search as both a patrol officer and as a narcotics detective and estimated that he has requested and obtained consent "over a hundred times."

In this case, Officer Graham testified that he was the backup for Officer McMahan when he pulled over Defendant on Highway 411 near the Vonore Drug Store. Officer McMahan had called Officer Graham after initiating the traffic stop of Defendant. Officer Graham advised Officer McMahan to ask Defendant for consent to search his vehicle. When Office Graham arrived at the scene, Defendant was standing in front of Officer McMahan's patrol car. Defendant had denied consent to search. Officer Graham observed Officer McMahan and Defendant while they spoke. Officer Graham testified that both men appeared to be calm and "nonchalant."

Because he and Officer Mahan had talked about getting a K-9 officer, Officer Graham returned to his patrol car and via cell phone requested the K-9 unit. When Officer Graham stepped out of his vehicle, Defendant asked him what was going on. Officer Graham informed him that a K-9 unit was on the way to conduct a sniff test of Defendant's truck. According to Officer Graham, Defendant stated that if it would "speed the process up, just go ahead and search." At that point, Officer Graham called off the K-9 unit and told Officer McMahan that Defendant had given him consent to search his truck.

Officer Graham recalled that Defendant remained standing in front of Officer McMahan's patrol car as Officer Graham searched Defendant's truck. Officer Graham confirmed that there was a passenger in the truck, and he conducted a normal field interview of the passenger. Officer Graham testified that Defendant did not make any effort to stop the search or engage in conversation during the search other than to point out that there may be tools in the truck. Officer Graham stated that at no point did Defendant withdraw his consent to search or instruct him to stop searching his truck. Officer Graham found a jacket in the backseat of the truck and in the jacket was a container with a crystal-like substance which appeared to be methamphetamine. He also found a pipe with methamphetamine residue.

---

[1] We will identify this witness according to the position he held at the time of the underlying facts.

Officer Graham had been issued a bodycam but he was not wearing it during the traffic stop because the battery had run out earlier that day. He agreed that he could have recorded the stop and the search with his cell phone but did not do so.

Officer Graham recognized the waiver and consent form Defendant signed. To the best of Officer Graham's knowledge, Defendant signed the form in a formal interview after the traffic stop was complete. Officer Graham was aware that Defendant had prior encounters with law enforcement but was not involved in the investigation of those encounters.

On cross-examination, Officer Graham testified that he had been trained on what constitutes a valid consent. He maintained that he called for the K-9 unit after Defendant had initially denied consent. Officer Graham confirmed that when he spoke with Officer McMahan via phone before arriving at the scene and advised Officer McMahan to ask Defendant for consent to search, Officer McMahan informed him that Defendant "usually consents." Defense counsel noted that the conversation between the officers occurred five minutes into the traffic stop and that Officer McMahan did not ask for consent until eight minutes and forty-five seconds into the stop. When asked why the K-9 unit was not called at that point, Officer Graham testified that the call was made after Defendant "denied consent to both [him]self and Officer McMahan." After Defendant consented to the search, Officer Graham called off the K-9 unit. He acknowledged that his conversation with Defendant wherein Defendant consented was not documented in a written report.

Officer Graham understood that the scope of a search can be limited. When Defendant agreed to the search of his truck, Defendant did not limit the scope of the search. Officer Graham acknowledged that he did not ask Defendant for consent to search each compartment of the truck nor did he ask for additional consent to search Defendant's jacket.

Defendant testified that Officer Graham told him that a K-9 unit was called to conduct a search. Defendant denied that he gave Officer Graham consent to search his truck or any specific part of his truck. He also denied asking Officer Graham whether it would "speed up the process" if he consented to a search. Defendant acknowledged that he stood and watched as Officer Graham searched his truck because he "d[id]n't know what else [he] was supposed to do." He insisted that he was going to tell Officer Graham not to search his truck but Officer Graham began searching the truck before Defendant could say anything.

Defendant testified that he did not know that Officer Graham was going to search his truck until he began performing the search. Defendant acknowledged that he did not ask Officer Graham why he was searching his truck or ask him to stop the search because

Officer Graham was "a police officer with a gun." He denied that he was trying to be helpful and maintained that he did not understand why a search was necessary for speeding.

Defendant admitted that he had been arrested before the search "more than two" times. During his prior arrests, Defendant was questioned by law enforcement. He was therefore "not completely" unaware of how the criminal justice system operates. He testified that he was on federal probation under supervision by the Federal Bureau of Prisons.

After hearing the evidence, the trial court denied Defendant's motion to suppress. In the trial court's oral ruling, the court accredited the testimonies of the two officers. The trial court believed Officer McMahan's testimony that he had previous experience with Defendant which included allegations of drug dealing and was "impressed with the level of professionalism" exhibited by Officer McMahan during the traffic stop. And "in spite of the cordial relationship between [Defendant and Officer McMahan]," the trial court believed that Officer McMahan was justified in requesting assistance for the traffic stop. The trial court concluded that the length of the stop was not unreasonably long. The trial court noted that because Defendant was unable to produce his driver's license, it took Officer McMahan longer to verify the validity of Defendant's status. The trial court also found that Officer McMahan was alerted about another call during the stop which reflected the normal course of an officer's patrol.

While the trial court agreed with the defense that Officer Graham should have had a working body camera because a recording from his vantage point would have been "very helpful," the trial court nonetheless accredited Officer Graham's testimony that Defendant had given consent. The trial court believed Officer Graham would not have performed the search without obtaining Defendant's consent. The trial court found that Officer Graham's testimony was supported by Defendant's behavior during the search noting that Defendant watched Officer Graham search his truck and at no time withdrew his consent or restricted the scope of the consent to a certain part of his truck. The trial court also found that Defendant could have refused to sign the waiver and consent form after the search but instead signed the form.

The trial court gave no weight to Defendant's testimony that he never consented to a search of his truck finding that Defendant's testimony was contradicted by Defendant's signed waiver and consent form, the testimonies of Officer McMahan and Officer Graham, and the casual behavior of Defendant and his passenger while Officer Graham was conducting the search.

The trial court concluded that based on the totality of the circumstances, Defendant had knowingly and freely given consent to search his vehicle. After the trial court made

its ruling, Defense counsel asked, for purposes of a potential interlocutory appeal or a Rule 37 certified question, whether the case presented issues dispositive of the case. The trial court disagreed that the case presented a dispositive issue relative to all the counts in the indictment:

> The charges in this case are possession with the intent to sell or deliver 26 grams or more of methamphetamine, possession of a firearm with intent to go armed. I didn't even hear about any guns. Possession of a firearm after having been convicted of a violent felony. So it's not dispositive of the case. It's dispositive perhaps of the drugs in Count 1.

After the trial court denied his motion to suppress, Defendant pled guilty to the drug-related charges. He was sentenced to fifteen years at 35% for possession of methamphetamine, three years at 100% for possession of a weapon during the commission of a dangerous felony, and fifteen years at 35% for the possession of a firearm by a convicted felon. The trial court ran the fifteen-year sentences concurrently with each other but consecutive to the three-year sentence.

At the plea submission hearing, the trial court reviewed the terms of the plea agreement as summarized above, and read the certified questions into the record:

> Whether the search of the defendant's vehicle violated the 4th Amendment of the United States Constitution or Article 1, Section 7 of the Tennessee Constitution based on the following questions:
>
> Whether the length of the officers' detention of the defendant prior to the defendant allegedly giving consent to search was unreasonable?
>
> Whether it is permissible for an officer to ask a suspect for consent to search a vehicle after the suspect has recently refused consent to search twice all while being detained?
>
> Whether an officer exceeds the scope of consent to search a vehicle by searching through a bag within the vehicle which the suspect did not explicitly give the officer consent to search and regarding which the officer did not ask for consent to search?

The trial court noted that "the parties agree that a finding related to the above outlined issues would be dispositive of the case." Under oath, Defendant confirmed the terms of the plea agreement including the decision to reserve a certified question. The trial court then advised Defendant of his rights, the State gave a summary of the factual basis

for the plea, and Defendant testified that he was pleading guilty because it was in his best interest to do so. The trial court accepted Defendant's plea and stated that the certified question "would be dispositive of the case." Defense counsel then asked the trial court to "approve the question" for purposes of appeal and the trial court responded as follows:

> Your Honor, I believe Rule 37 actually requires the Court to not only find it's dispositive, but to approve the question itself. Just so – I'm making sure my records [are] preserved on appeal. Could the Court please approve the question?

> The Court: Sure. I will approve the question. And I do find that it's dispositive.

Judgments were entered and the certified question was identified in all three judgment forms. Below the certified question is the following sentence: "The parties agree that a finding related to the above outlined issues would be dispositive of the case." Defendant filed a timely appeal from the entry of the judgments.

## Analysis

Defendant claims the trial court erred by denying his motion to suppress because the evidence preponderates against the court's finding that he consented to the search of his truck. He also claims the length of the detention before his arrest was unreasonable. Specifically, Defendant argues that it was unreasonable for the officers to wait to call the K-9 unit after he had denied consent a second time, and to continue to detain him after he had been issued the citation for speeding.

The State argues that the appeal should be dismissed because the certified question does not comply with Tennessee Rule of Criminal Procedure 37(b)(2)(A) ("Rule 37(b)"), and because the certified question is not dispositive. Alternatively, the State argues that should this court find that the procedural requirements have been met and the certified question is dispositive, that the trial court did not abuse its discretion in denying Defendant's motion to suppress the evidence found in the search of Defendant's truck. Although squarely raised as the first issue in the State's brief regarding the alleged deficiencies in the certified question, Defendant chose not to file a reply brief. *See* Tenn. R. App. P. 27(c). Having reviewed the record and the relevant legal authority, we agree with the State that Defendant failed to comply with the requirements of Rule 37(b).

Whether the certified question is dispositive of the case is a question of law which we review de novo. *See, e.g., State v. Scott*, 619 S.W.3d 196, 203 (Tenn. 2021) (citing *State v. Dailey*, 235 S.W.3d 131, 134-35 (Tenn. 2013). "[T]he reviewing court must make

an independent determination that a certified question is dispositive." *Dailey*, 235 S.W.3d at 135.

Under Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, a defendant, may plead guilty and "explicitly reserve – with the consent of the state and of the court," a certified question of law that is dispositive of the case for appeal, so long as the following requirements are met:

> (i) the judgment of conviction or order reserving the certified question that is filed before the notice of appeal is filed contains a statement of the certified question of law that the defendant reserved for appellate review;

> (ii) the question of law as stated in the judgment or order reserving the certified question identifies clearly the scope and limits of the legal issue reserved;

> (iii) the judgment or order reserving the certified question reflects that the certified question was expressly reserved with the consent of the state and the trial court; and

> (iv) the judgment or order reserving the certified question reflects that the defendant, the state, and the trial court are of the opinion that the certified question is dispositive of the case[.]

Because these procedural requirements are "explicit and unambiguous," they must be strictly followed. *State v. Armstrong*, 126 S.W.3d 908, 912 (Tenn. 2003) (quoting *State v. Irwin*, 962 S.W.2d 477, 479 (Tenn. 1998)). "[A] substantial compliance standard would be very difficult to apply in a consistent and uniform manner, and therefore would conflict with the very purpose of *Preston*." *Id.* In *State v. Preston*, 759 S.W.2d 647, 650 (Tenn. 1988), the Supreme Court provided "explicit" guidance on "what the appellate courts will hereafter require as prerequisites to the consideration of the merits of a [certified] question of law." Indeed, Rule 37(b) was amended in 2002, to specifically include the *Preston* requirements. *State v. Melissa A. Simmons*, No. M2003-03064-CCA-R3-CD, 2005 WL 468295, at *2 (Tenn. Crim. App. Feb. 23, 2005).

Consistent with the Tennessee Rules of Appellate Procedure, Defendant, as the appellant, carries the burden of insuring that all the prerequisites of Rule 37(b) are in the final order or judgment and that "the record brought to the appellate courts contains all of the proceedings below that bear upon whether the certified question of law is dispositive and the merits of the question certified." *Id.*; *see also e.g.,* Tenn. R. App. P. 24(b) ("the appellant shall have prepared a transcript of such part of the evidence or proceedings as is

necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal").

On appeal, the State maintains that Defendant failed to properly reserve the certified question because the judgments do not reflect that the certified question was expressly reserved with the consent of the trial court and that the trial court was of the opinion that the certified question was dispositive of the case. The Special Conditions box on each of the three judgment forms notes the certified question reserved in this case. Below the certified question is the following sentence: "The parties agree that a finding related to the above outlined issues would be dispositive of the case."

While the above sentence reflected on the judgment is clear that the State is of the opinion that the certified question is dispositive, it does not state that the trial court is of the opinion that the question is dispositive. *See* Tenn. R. Crim. P. 37(b)(2)(A)(iv) ("the judgment or order reserving the certified question reflects that the defendant, the state, *and the trial court* are of the opinion that the certified question is dispositive of the case") (emphasis added). We agree with the State that the trial court is not a "party" with an interest in the outcome of the case and is therefore not included in the language on the judgment form about the dispositive nature of the certified question. *See* Black's Law Dictionary (11th ed. 2019) ("Party": One by or against whom a lawsuit is brought; anyone who both is directly interested in a lawsuit and has a right to control the proceedings, make a defense, or appeal from an adverse judgment").

The trial court's oral finding at the plea hearing stating its opinion on the dispositive nature of the certified question does not save this appeal from dismissal because Rule 37(b) requires the trial court's opinion be in "the judgment or order reserving the certified question" and not in some other part of the record. *See, e.g., Preston*, 759 S.W.2d at 650 ("Regardless of what has appeared in prior petitions, orders, colloquy in open court or otherwise, the final order or judgment from which the time begins to run to pursue a T.R.A.P. 3 appeal must contain a statement of the dispositive certified question of law reserved by defendant for appellate review and the question of law must be stated so as to clearly identify the scope and the limits of the legal issue reserved").

Furthermore, the trial judge's signature on the judgments containing the certified question is insufficient to demonstrate the judge's consent to reserving the certified question and the judge's opinion that the question is dispositive of the case. *See State v. Scott Eric McDonald*, No. E2006-02568-CCA-R3-CD, 2007 WL 4460141, at *3 (Tenn. Crim. App. Dec. 20, 2007) ("[w]hile it may be inferred from the placement on the judgment that the State and the court agreed, it is not explicitly stated as required by the rule. Thus, we must agree with the State that the Appellant has failed to properly certify this question of law"). To hold otherwise would run contrary to *Preston.*

- 13 -

We likewise hold that the judgments do not reflect that the certified question was expressly reserved with the consent of the trial court and the State. *See* Tenn. R. Crim. P. 37(b)(2)(A)(iii) ("the judgment or order reserving the certified question reflects that the certified question was expressly reserved with the consent of the state and the trial court"); *see also Scott Eric McDonald*, 2007 WL 4460141, at *3 (certified question appeal dismissed where "[n]owhere on the document is there any mention that the State and the trial court consented to the reservation or that they agreed that the question was dispositive"); *State v. Michael Lamar Pritchett*, No. W2008-02396-CCA-R3-CD, 2009 WL 2767136, at *3 (Tenn. Crim. App. Aug. 31, 2009) (this court declined to address whether certified question was sufficiently limited in scope where the final order failed to state whether the certified question was expressly reserved as part of the plea agreement, that the state and the trial judge consented to the reservation, and that the state and the trial judge agreed that the question was dispositive of the case); *State v. Melissa A. Simmons*, No. M2003-03064-CCA-R3-CD, 2005 WL 468295, at *3 (Tenn. Crim. App. Feb. 23, 2005) (appeal dismissed where documents did not show that the certified question was "expressly reserved with the consent of . . . the trial judge" or that "the trial judge [is] of the opinion that the certified question is dispositive of the case"); *State v. Jonathan A. Wheatley*, No. M2019-00071-CCA-R3-CD, 2020 WL 774161, at *3 (Tenn. Crim. App. Feb. 18, 2020) (appeal dismissed where neither the judgment nor the order containing the certified questions contained the requisite statements that the State and the trial court agreed to the reservation of a certified question, and that the Defendant, the State, and the trial court were of the opinion that the certified questions were dispositive of the case). This court is without jurisdiction to consider this appeal due to the lack of compliance with Rule 37(b).

Moreover, had the judgments reflected that the certified question was expressly reserved by the trial judge and the State, and found by the trial judge to be dispositive as required under Rule 37(b), the certified question here is not dispositive of the case. The question does not "clearly identify the scope and the limits" of the issue. *See* Tenn. R. Crim. P. 37(b)(2)(A)(ii). Defendant's question consists of a prefatory question and three sub-questions. The prefatory question – whether the search of Defendant's vehicle violated the 4th Amendment of the United States Constitution or Article 1, Section 7 of the Tennessee Constitution – is overly broad. *State v. Sean Matthew Houser*, No. E2020-01389-CCA-R3-CD, 2022 WL 1184057, at *3-4 (Tenn. Crim. App. Apr. 21, 2022) (holding certified question was overly broad for failing to identify the issue preserved for appeal). On the other hand, the three sub-questions are too narrowly drawn as they do not encompass the trial court's holdings on the issues presented, and the questions further fail to set forth the legal basis and relief for Defendant's claim.

## CONCLUSION

Because the certified question set forth in the judgments fails to comply with the requirements of Rule 37(b), this court lacks jurisdiction to consider the certified question. Accordingly, we will not address the merits of the certified question. The appeal is dismissed.

_____
JILL BARTEE AYERS, JUDGE